**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION**

| | |
|---|---|
| Faith Franchising Company, LLC, ) | |
| ) | |
|    Plaintiff, ) | |
| ) | Civil Action No.:2:26-cv-2200 |
|       v. ) | |
| ) | |
| Bluegrass Cleaning & Maintenance, LLC d/b/a ) | |
| Office Pride of Fort Myers-Cape Coral, Bill ) | |
| Staggs, Crystal Staggs, Integrity Companies, ) | |
| LLC d/b/a Integrity Commercial Cleaning, ) | |
| Trent Howe ) | |
| ) | |
|    Defendants. | |

**COMPLAINT FOR INJUNCTIVE RELIEF**

For its Complaint against Defendants Bluegrass Cleaning & Maintenance, LLC d/b/a Office Pride of Fort Myers-Cape Coral ("Bluegrass"), Bill Staggs ("Bill Staggs"), Crystal Staggs ("Crystal Staggs"), Integrity Companies, LLC d/b/a Integrity Commercial Cleaning ("Integrity"), and Trent Howe ("Howe") (collectively "Defendants"), Plaintiff Faith Franchising Company, LLC ("Faith Franchising" or "Plaintiff") states and alleges as follows:

**INTRODUCTION**

1.    Faith Franchising brings this action to stop a calculated scheme perpetrated by its former franchisees and their longtime employee to steal Office Pride customers, misappropriate its trade secrets, and destroy the goodwill Faith Franchising spent years building in the Fort Myers, Florida market.

2.      Until recently, Bill and Crystal Staggs, through Bluegrass (collectively, "Franchisee") operated Office Pride of Fort Myers-Cape Coral ("OPFMCC"), a successful OFFICE PRIDE® franchise. By agreeing to operate an OFFICE PRIDE® franchise, Franchisee was given permission to trade on Faith Franchising's goodwill and reputation by using Faith Franchising's federally registered trademarks, its confidential and proprietary information, and its methods of doing business. In exchange, Franchisee promised (among other things) that it would not misuse Faith Franchising's trade secrets and that it would not divert customers or have any direct or indirect interest in any capacity in a competing business both during the term of operation and for 24 months after.

3.      Notwithstanding these ongoing obligations, Defendants engaged in a deliberate and coordinated scheme to steal Faith Franchising's trade secrets and Confidential Information and convert Faith Franchising's goodwill to their own benefit. While still employed by Franchisee, Howe secretly built Integrity as a continuation of OPFMCC—using the same warehouse, vehicles, equipment, and employees to serve the same customers—while Bill Staggs concealed Howe's plan. Among other things Bill Staggs falsely attributed Howe's eventual resignation to a family tragedy rather than disclose that Howe was launching a competing business with Bill Staggs' knowledge, support, and active participation.

4.      Both before and after his resignation, Howe exploited his access to Faith Franchising's trade secrets and Confidential Information—including customer lists, pricing data, and account details—and he traded on OFFICE

PRIDE®'s goodwill, including by continuing to use his @officepride.com email address, to solicit and service Faith Franchising's customers through Integrity.

5.     Bill Staggs did not merely look the other way. He conspired and worked in active concert with Howe to strip OPFMCC of its valuable assets and damage OFFICE PRIDE®'s goodwill, and he continues to provide material support for Integrity's operations to this day.

6.     Faith Franchising seeks injunctive relief to halt Howe and Integrity's misappropriation of trade secrets and other proprietary information, to stop Franchisee's ongoing violations of its post-termination non-competition, non-solicitation, and confidentiality obligations, and to prevent further irreparable harm to Faith Franchising's goodwill that cannot be remedied by money damages alone. Every day that passes, Integrity continues to service Faith Franchising's customers and entrench itself further in those relationships. It further seeks all other remedies available, including compensatory, exemplary, and punitive damages and attorney's fees given the intentional and willful nature of Defendants' illegal conduct.

## THE PARTIES

7.     Faith Franchising Company, LLC is a Delaware limited liability company with its principal place of business in Palm Harbor, Florida. It is in the business of franchising janitorial services under the OFFICE PRIDE® brand name.

8.     Defendant Bluegrass is a Florida limited liability company. Upon information and belief, Bluegrass's members are Bill Staggs and Crystal Staggs.

9. Defendants Bill Staggs and Crystal Staggs are, upon information and belief, citizens of Florida.

10. Defendant Integrity is a Florida limited liability company with a principal place of business and registered agent in Fort Myers, Florida. Upon information and belief, Integrity's member is Howe.

11. Defendant Howe is, upon information and belief, a citizen of Florida.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.* The DTSA provides a federal civil cause of action for the misappropriation of trade secrets that are "related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1). Defendants misappropriated Plaintiff's trade secrets, including confidential customer information, pricing data, customer account details, and Office Pride's proprietary methods of operations, which were used in, and intended for use in, interstate commerce.

13. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims arise from a common nucleus of operative fact with Plaintiff's DTSA claim. The state law claims— including breach of the Franchise Agreement, misappropriation of trade secrets under the Florida Uniform Trade Secrets Act, tortious interference with business relationships, civil conspiracy, unfair competition, fraudulent concealment, and

4

unjust enrichment—are all based on the same coordinated scheme by Defendants to misappropriate Faith Franchising's trade secrets and divert its customers, and they are so related to the DTSA claims that they form part of the same case or controversy under Article III of the United States Constitution.

14.     Pursuant to the terms of the Franchise Agreement entered into by Franchisee with Faith Franchising, the parties agreed to submit to the jurisdiction of the state or federal courts of Florida to resolve a dispute involving preliminary relief. A true and correct copy of the Franchise Agreement is attached as **Exhibit A** (the "Agreement").[1]

15.     Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including the customer diversion and misappropriation of confidential information in Lee and Pinellas Counties, and because all Defendants reside in this District.

---

[1] The Agreement is between Faith Franchising Company, Inc., which was converted to Faith Franchising Company, LLC (a Delaware LLC) on November 29, 2021. By operation of Delaware law, Faith Franchising Company, LLC stands in the shoes of Faith Franchising Company, Inc. to enforce the agreement. 6 Del. Code § 18-214 ("When an other entity has been converted to a limited liability company pursuant to this section, for all purposes of the laws of the State of Delaware, the limited liability company shall be deemed to be the same entity as the converting other entity and the conversion shall constitute a continuation of the existence of the converting other entity in the form of a domestic limited liability company."); *ARCPE Bahamas LLC v. Neuman*, No. 1:19-CV-24654-UU, 2021 WL 2580333, at *1 (S.D. Fla. Apr. 9, 2021) (noting that "under the plain language of that statute, the LLC was the same entity as the corporation").

16.     Venue is proper in the Fort Myers Division under L.R. 1.04 because the Fort Myers Division encompasses Lee County, the county most directly connected to this action and the county in which this action is most conveniently advanced.

## I.   FACTUAL BACKGROUND

### A.   The Office Pride® Business System

17.     Faith Franchising Commercial Cleaning Services was founded in 1992 by Todd Hopkins to provide high-quality janitorial services. Today, Faith Franchising is a national commercial cleaning franchise with 142 franchises across 27 states as of December 31, 2025. Today, the franchised businesses operate under the OFFICE PRIDE® name and other distinctive marks.

18.     Faith Franchising offers a business format franchise. As such, it offers to its franchisees an entire method of doing business. As is typical with a business format franchise, Faith Franchising licenses its franchisees to use a comprehensive method of conducting operations under Faith Franchising's Methods of Operations, including proprietary business formats, methods, procedures, standards, and specifications (collectively, the "System").

19.     Faith Franchising franchisees operate their OFFICE PRIDE® cleaning businesses using the unique and distinctive System developed by Faith Franchising, including an inherently distinctive trade dress, signage, specifications, advertising, trade practices, operating methods, various business forms, training materials, manuals (including the Methods of Operations),

collective knowledge, skill, and experience of the Franchisor and entire franchise network, sales techniques, billing services, vendor lists and discounts, and customized, proprietary business management software.

### B. The Franchise Agreement

20.     On or about May 20, 2016, Faith Franchising and Bluegrass entered into the Agreement granting Franchisee the right to open and operate an OFFICE PRIDE® commercial cleaning business in the Fort Myers, Florida metro market (the "Business") subject to all conditions and terms of the Agreement. Bluegrass, Bill Staggs, and Crystal Staggs each executed the Agreement.

21.     In addition, contemporaneously with execution of the Agreement, Bill Staggs and Crystal Staggs each executed a Personal Guarantee agreeing to be "personally bound by each and every condition and term contained in the Agreement, including, but not limited to the non-compete provisions in Article 15.4," and agreeing that the Personal Guarantee would be construed just as though each of them had "executed a franchise agreement containing the identical terms and conditions of this Franchise Agreement." *Id*. at Exhibit B ("Personal Guarantee").

### C. Faith Franchising's Trade Secrets and Protective Measures

22.     Faith Franchising's System, Methods of Operations, proprietary software, and Confidential Information — including its customer lists, customer contact information, pricing and billing data, account details, and proprietary business methods — constitute trade secrets under both the Florida Uniform Trade

Secrets Act, Fla. Stat. § 688.002(4) and the federal Defend Trade Secrets Act, 18 U.S.C. § 1839(3). This information includes compilations of customer-specific data not generally known to the public or to Faith Franchising's competitors, including the identities of commercial cleaning customers, the terms and pricing of their service agreements, their particular cleaning requirements and schedules, the contact information for key decision-makers at each account, and the history of the customer relationship.

23.   The Confidential Information derives independent economic value, actual and potential, from not being generally known to, and not being readily ascertainable by proper means by, Faith Franchising's competitors or the public. A competitor with access to Faith Franchising's customer lists, pricing data, and account details could immediately solicit Faith Franchising's customers with targeted pricing and service proposals—without investing the time, effort, and expense that Faith Franchising and its franchisees have expended over years to identify prospective customers, develop relationships, and learn each customer's specific requirements.

24.   Faith Franchising takes reasonable measures to maintain the secrecy of its Confidential Information. These measures include: (a) requiring all franchisees to execute franchise agreements containing confidentiality and non-disclosure provisions; (b) restricting access to the Vine, Faith Franchising's intranet system, to authorized users with login credentials; (c) requiring franchisees to maintain the absolute confidentiality of Confidential Information

during and after the term of their franchise agreements; and (d) requiring franchisees to return all confidential materials upon termination. (Exhibit A [Agreement] §§ 6.2, 6.3, 15.3.)

25.    Faith Franchising's trade secrets relate to services used in, and intended for use in, interstate commerce within the meaning of 18 U.S.C. § 1836(b)(1). Faith Franchising is a national commercial cleaning franchise operating 142 franchises across 27 states as of December 31, 2025. Its System—including its Methods of Operations, proprietary business management software, training materials, and the Vine intranet—is developed and disseminated across state lines to franchisees nationwide. Faith Franchising's Confidential Information, including customer data, pricing structures, and operational procedures, is transmitted interstate through electronic systems, used to support a franchise network that spans multiple states, and is integral to Faith Franchising's interstate business operations. The commercial cleaning services provided using Faith Franchising's trade secrets serve customers engaged in interstate commerce, and the supplies, equipment, and materials used in connection with the System are purchased and shipped across state lines.

### D.  Franchisee's Exclusivity and Confidentiality Obligations

26.    Under the Agreement, Franchisee undertook legal duties designed to protect Faith Franchising's confidential information, to require Franchisee to devote their efforts to the Business and not to a competing business, and to protect the integrity of the System.

27.     Article 6 governs the treatment of Confidential Information, which includes, but is not limited to:

> 6.1.1 The System, the Methods of Operations, any other proprietary materials, the sales and marketing techniques used, and knowledge of and experience in developing and operating OFFICE PRIDE® businesses;
>
> 6.1.2 Marketing and advertising programs for OFFICE PRIDE® businesses;
>
> 6.1.3 Knowledge of specifications for and suppliers of certain ancillary goods, services, equipment, materials and supplies; and
>
> 6.1.4 Knowledge of the operating results and financial performance of OFFICE PRIDE® businesses other than the BUSINESS.

*Id.* §§ 6.1.1-6.1.4.

28.     Customer contracts and customer lists are part of the System protected under Article 6 ("Confidential Information"). *Id.* § 6.4.

29.     Franchisee further acknowledged and agreed that, upon termination or expiration of the Agreement, at Faith Franchising's option, "all customer contracts and customer lists become solely our property upon our giving notice to you." *Id.* §§ 6.4, 14.3.

30.     Franchisee expressly acknowledged the value and proprietary nature of the Confidential Information and acknowledged Faith Franchising's exclusive ownership of the Confidential Information. Franchisee agreed to use Confidential Information only in the operation of the Business and acknowledged that use of Confidential Information in any other business would constitute an unfair method of competition. *Id.* § 6.2.

31. Franchisee's non-disclosure obligations are ongoing and continue after termination. Franchisee agreed it would "maintain the absolute confidentiality of Confidential Information during and after the term of this Agreement." *Id.* § 6.2.2.

32. Franchisee agreed that Faith Franchising's need to protect the Confidential Information for the benefit of all franchisees requires an exclusive relationship. Because of this, Franchisee agreed that during the term of the Agreement, it would not:

> 7.1.1 Have any direct or indirect interest as a disclosed or beneficial owner in a Competitive Business;
>
> 7.1.2 Perform services as a director, officer, manager, employee, consultant, representative, agent or otherwise for a Competitive Business;
>
> . . .
>
> 7.1.4 Divert or attempt to divert any commercial cleaning business or customer to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious to the goodwill associated with the Marks.

*Id.* §§ 7.1.1-7.1.2, 7.1.4 (the "In-Term Non-Compete").

33. "Competitive Business" means "any commercial cleaning or similar business (other than an OFFICE PRIDE® business operated under a franchise agreement with us)." *Id.* § 7.2.

34. Franchisee also promised to "at all times faithfully, honestly and diligently perform [their] obligations," to "continuously exert [their] best efforts to promote and enhance the BUSINESS," and to observe "high standards of honesty,

integrity, fair dealing and ethical business conduct in all dealings with customers, suppliers and [Faith Franchising]." *Id.* §§ 1.6, 8.1.13.

35.     Under § 11.1, Faith Franchising has the right at any time during regular business hours, without prior notice, to inspect the franchisee's operations, premises, records, and systems, including customer contracts. Franchisee's full cooperation is required under § 11.2.

### E.  **Franchisee's Post-Termination Covenants**

36.     The Agreement also contains post-termination promises by Franchisee designed to protect Faith Franchising's Confidential Information and to prevent the conversion of Faith Franchising's goodwill.

37.     Upon termination or expiration, Franchisee agreed to "immediately cease to use any of [Faith Franchising's] Confidential Information in any business or otherwise and return to us all copies of the Methods of Operations and any other confidential materials." *Id.* § 15.3.

38.     Upon termination or expiration, Franchisee agreed to a 24-month post-termination non-compete:

> [N]either you nor any of your owners will have any direct or indirect interest as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent or in any other capacity in any Competitive Business (as defined in Article 7.2. above) operating within the greater of (i) a 50-mile radius around the location of your **OFFICE PRIDE**® Business; or (ii) the metropolitan area in which your **OFFICE PRIDE**® Business is located.

*Id.* § 15.4.3 (the "Post-Term Non-Compete").

39.    The Post-Term Non-Compete protects Faith Franchising's legitimate business interest in its goodwill, including ongoing and future revenues from customers developed during the franchise relationship using Faith Franchising's Marks and System. It also protects Faith Franchising's interest in refranchising the territory and in ensuring that other franchisees do not perceive their covenants as optional.

40.    If any person restricted by Section 15.5 fails to comply, the Restriction Period commences upon entry of a court or arbitrator order enforcing the provision. *Id.* § 15.5.

41.    Upon termination or expiration, customer contracts and customer lists become solely Faith Franchising's property upon notice. *Id.* §§ 6.4, 14.3.

## F.    **While Employed by OPFMCC, Howe Built a Competing Business**

42.    In December 2020, Bluegrass hired Howe as Director of Operations for OPFMCC. In that role, Howe had broad access to Faith Franchising's trade secrets, including its Systems and Methods of Operations and Confidential Information that comprises customer lists, customer contact details, pricing and billing data, account information, operational procedures, and proprietary business methods. Howe regularly accessed Faith Franchising's intranet system, referred to as the Vine.

43.    Howe was not authorized to use or disclose OFFICE PRIDE®'s trade secrets and other Confidential Information for any purpose outside of OPFMCC's business as an OFFICE PRIDE® franchise.

13

44. While still employed by OPFMCC, and without informing Faith Franchising, Howe took steps to form a competing commercial cleaning business in the same Fort Myers-Cape Coral market served by OPFMCC:

(a) On September 24, 2025, Howe registered the domain name iccswfl.com, the web address for Integrity's website.

(b) On October 16, 2025, Howe formed Integrity Companies, LLC under Florida law, with himself as the sole manager and registered agent.

(c) On November 3, 2025, Howe registered the fictitious name "Integrity Commercial Cleaning" under Integrity Companies, LLC.

45. Integrity is a "Competitive Business" as defined in § 7.2 of the Agreement because it is a "commercial cleaning or similar business." Integrity operates in the Fort Myers, Florida metro market, the same market in which OPFMCC operated under the Agreement.

46. During the period when Howe was launching Integrity, Howe made it appear that Integrity was related to OFFICE PRIDE® in order to trade off of OFFICE PRIDE®'s goodwill.

47. For example, Integrity held itself out to the Lee Building Industry Association of Florida as operating from the same address as OPFMCC (10241 Metro Parkway, Suite 111, Fort Myers, FL), identified itself as Office Pride within its "About Us" section, and linked from its own company listing to OPFMCC's Facebook page.

48. Howe's scheme to unfairly compete by trading on Integrity's close relationship with OFFICE PRIDE® succeeded. For example, on March 5, 2026,

14

while Howe was still employed by OPFMCC, an OPFMCC customer emailed Howe at his OFFICE PRIDE® email address to notify him it had to terminate its cleaning services from "Office Pride / Integrity":

> **From:** CHIARAMONTE Gene AWS <gene.chiaramonte@crociusa.com>
> **Sent:** Thursday, March 5, 2026 3:42 PM
> **To:** Trent Howe <trenthowe@officepride.com>
> **Subject:** RE: Past Due Notice – Office Pride Invoice(s) Considerably Past Due
>
> WARNING EXTERNAL EMAIL
> Hi Trent.  I am sorry to have to notify you of this decision, but the company has elected to switch to an alternative vendor for its custodial services, effective April 2026.   Unfortunately, the company has endured some its worst revenues in the last 6 months, and our corporate office has demanded we cut costs within every facet of the business.  And so, this decision was made purely for financial reasons only.  Therefore, services from Office Pride / Integrity will terminate, effective the end of March 2026.
>
> Please give me a call or stop by next week so we can work out the final details.  We have started to reduce our work weeks as well, so the offices will be closed tomorrow.  Again, I am very sorry… I hope you can understand our position.  Thx.
>
> Regards,

49.     Thus, long before Faith Franchising had any knowledge of Integrity's existence, an OPFMCC customer appears to have understood Integrity was related to or affiliated with Office Pride, referring to it "Office Pride / Integrity." This also demonstrates that the intentional conflating of the two businesses was well underway by early March 2026.

50.     When Howe replied to this customer from his OFFICE PRIDE® email address, he did nothing to correct their mistaken belief, but simply wrote, "Sorry that you will be leaving us, but I understand. If anything changes in the future, please let me know as we would love to come back and provide the cleaning services."

51.     Howe's scheme to exploit his prior affiliation with OFFICE PRIDE® to divert customers to Integrity continued after he resigned. For example, on April

21, 2026, a former OPFMCC customer emailed Howe at his OFFICE PRIDE® email address requesting that a "New Service Agreement" be provided in a fillable PDF format. Because no new OPFMCC service agreement could have been executed in late April, a full month after Bill Staggs announced he was winding down the business, this email shows that customers continued to contact Howe at his OFFICE PRIDE® email even as he transferred their business to Integrity.

> From  Elisabeth Marrone <emarrone@kcaeng.com>
> Date  Tue 4/21/2026 8:49 AM
> To    Trent Howe <trenthowe@officepride.com>
>
> WARNING EXTERNAL EMAIL
> Good Morning Trent!
>
> I spoke with Richard this morning, are you able to send me the service agreement as a fillable PDF? The PandaDoc is giving us trouble and he is more comfortable using the PDF format.

52.     Further, during the month of February 2026, Howe contacted nearly 50 of OPFMCC's accounts to set up in-person meetings. On information and belief, these meetings were for the purpose of securing service contracts for Integrity with OPFMCC customers.

G. **Bill Staggs' Knowledge, Misrepresentation, and Wind-Down of OPFMCC**

53.     Bill Staggs knew that Howe registered iccswfl.com, formed Integrity Companies, LLC, and filed a DBA for Integrity Commercial Cleaning all while Howe was employed by OPFMCC.

54.     Despite this knowledge, Bill Staggs failed to take any steps during the course of Howe's employment to protect Faith Franchising's trade secrets and Confidential Information from Howe.

16

55.   In mid-March 2026, when Howe resigned from OPFMCC, Bill Staggs did not disclose to Faith Franchising that Howe had formed a competing business. Instead, Bill Staggs reported to Faith Franchising that Howe intended to step away from work following a family tragedy. That was false, because Howe never stepped away from work but instead was devoting his efforts to building Integrity even while employed by OPFMCC.

56.   As Howe was getting Integrity up and running, on March 20, 2026, Bill Staggs sent a letter to Faith Franchising's CEO Doug Phillip giving Faith Franchising sixty (60) days' written notice of his intent to wind down the business.

57.   When Faith Franchising learned of OPFMCC's intent to close, Faith Franchising offered to purchase the OPFMCC business. However, after preliminary discussion, Bill Staggs abruptly terminated negotiations, indicating that he would wind down the business instead.

58.   On information and belief, Bill Staggs' refusal to sell OPFMCC was motivated by a desire to assist Integrity and Howe in capturing Office Pride's customers and goodwill in the Fort Myers Cape Coral commercial cleaning market.

59.   When Faith Franchising initially learned about Integrity, it did not know if Bill Staggs was involved. In order to better understand the facts, Faith Franchising sought to inspect OPFMCC pursuant to Section 11.1 of the Agreement.

60.   Bill Staggs refused to allow an inspection without having his attorney present, in clear violation of Faith Franchising's unconditional right to inspect the business. (Exhibit A § 11.1)

61. At a minimum, these actions breached affirmative duties owed Faith Franchising to "at all times faithfully, honestly and diligently perform" Franchisee's obligations and to observe "high standards of honesty, integrity, fair dealing and ethical business conduct in all dealings with customers, suppliers and" Faith Franchising. (Exhibit A § 1.6.)

62. On or about May 20, 2026, the Agreement expired and OPFMCC ceased to be an OFFICE PRIDE® franchisee. The Post-Term Non-Compete (§ 15.4) became operative as of that date, binding Franchisee for a period of 24 months.

63. As detailed below, Faith Franchising has since learned that Franchisee violated its in-term obligations and its post-termination covenants not to compete.

## H.  **Bill Staggs and Howe Conspired to Build Integrity**

64. When confronted with Faith Franchising's suspicion that Bill Staggs was aware of and involved in Howe's launch of Integrity, Bill Staggs, through counsel, denied any knowledge or involvement. His counsel stated that "Mr. Staggs is not, and has never been, involved in Integrity Commercial Cleaning. He holds no ownership interest in it, has no role in its operations, and possesses no Integrity records, marketing materials, contracts, invoices, or correspondence." Those representations now appear to have been inaccurate.

65. Long before Bill Staggs sent Faith Franchising the March 20, 2026 letter, and continuing throughout OPFMCC's wind-down period and to the present day, Howe and Staggs worked together to position Integrity to absorb OPFMCC's

18

customers and worked together to methodically divert OPFMCC customers to Integrity.

66. That this was their plan all along is evident from a February 27, 2026 email Faith Franchising recently discovered, in which Bill Staggs forwarded Howe advice about fleet gas card options and added, "Something to think about after the switch over . . . ."



FW: (BSC Mastermind Group) Gas Cards for Fleet

From Bill Staggs <billstaggs@officepride.com>
Date Fri 2/27/2026 10:51 AM
To     Trent Howe <trenthowe@officepride.com>

Something to think about after the switch over…

**Bill Staggs | General Manager**
Office Pride Commercial Cleaning Services
10241 Metro Pkwy, Suite 111 | Fort Myers, FL 33966
O: 239.368.1219|D: 239.206.1589 | OfficePride.com/0288

**From:** Alejandro Florez (Basecamp) <notifications@3.basecamp.com>
**Sent:** Friday, February 27, 2026 11:20 AM
**To:** Bill Staggs <billstaggs@officepride.com>
**Subject:** Re: (BSC Mastermind Group) Gas Cards for Fleet

WARNING EXTERNAL EMAIL
Wex ended sucking for us. We stopped using them, they charged a service fee we didn't catch, ended up in collections for $500 over 2.95 in fees believe.

We are using Amex with permissions/parameter, plus there's only one card in the office that all drivers use. Fortunately we're across the street from a Wawa so it works for us

67. As detailed *infra* ¶¶ 75-101, Faith Franchising has now documented that Integrity is a continuation of OPFMCC, using the same employees, warehouse location, and equipment to service OPFMCC's customers. "The switch over" was

shorthand for Howe and Bill Staggs' scheme for this transfer of OPFMCC to Integrity. It shows that Staggs and Howe had been conspiring for months.

68.   On March 20, 2026, after Howe had resigned, and on the same day that Bill Staggs notified Faith Franchising of his intention to wind down OPFMCC's operations, an OPFMCC customer, Joint Implant Surgeons of Florida, emailed Howe at his Office Pride email address requesting a new price quote. Minutes later, Bill Staggs replied on Howe's behalf, promising to "take a look" and that he would "work something out, no worries."

---

**From:** Bill Staggs <billstaggs@officepride.com>
**Sent:** Friday, March 20, 2026 9:31 AM

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**To:** Tammy Egloff <tammy@jointimplant.com>
**Subject:** RE: [External] Pricing

Hey Tammy,

Trent is out today, so I'll take a look at this and get this back to you.  We'll work something out, no worries.

Thanks
Bill

**From:** Tammy Egloff <tammy@jointimplant.com>
**Sent:** Friday, March 20, 2026 9:23 AM
**To:** Trent Howe <trenthowe@officepride.com>
**Subject:** Pricing

WARNING EXTERNAL EMAIL
Good morning,

Can you give me another price quote for the cape Coral office.  The partners are having me do new estimates on all locations. Also, can you do any better on the price in Fort Myers?

---

20

69.    Bill Staggs certainly did not intend to provide a new price quote for services from OPFMCC because he had already decided to wind down OPFMCC by March 20, 2026.

70.    On information and belief, Bill Staggs instead intended to divert Joint Implant Surgeons of Florida to Integrity as part of the scheme to ensure that by the time OPFMCC ceased operations, its customers, operations and its value as a going concern had been "switched over" to Integrity.

71.    It appears that Bill Staggs did "work out" a deal with Joint Implant Surgeons of Florida on behalf of Integrity, because Integrity employees have been documented driving an Integrity work van and entering and exiting Joint Implant Surgeons of Florida in the evenings with cleaning equipment.

72.    On May 18, 2026, Bill Staggs emailed an OPFMCC customer, Florida Neurology Group. After first casting aspersions on Faith Franchising, he gave the customer new contact information, encouraged them to "ignore all emails from officepride.com," and closed with "I wish you well with your next service provider."

73.    On information and belief, Bill Staggs knew that the "next service provider" was Integrity, because Integrity employees recently have been documented driving an Integrity work van and entering and exiting Florida Neurology Group in the evening.

74.    These allegations demonstrate that Bill Staggs violated Article 7 of the Agreement during its term by "divert[ing] or attempt[ing] to divert . . . commercial cleaning business" to Integrity, by committing acts that are "injurious or

21

prejudicial to the goodwill associated with the Marks," and by serving the interests of a Competitive Business (Integrity). (Exhibit A § 7.)

## I. Integrity Operates as a Continuation of OPFMCC—with Bill Staggs' Full Knowledge and Support

75. Bill Staggs' material support for Integrity continued after the Agreement ended and runs up through the present day. His substantial and ongoing material support for Integrity's operations directly contradicts his representations through counsel that he "is not, and has never been, involved in Integrity Commercial Cleaning" and that he has "no role in its operations."

76. Bill Staggs has provided and continues to provide material support for Integrity's operations in at least three ways: allowing Integrity to operate from the former OPFMCC warehouse; transferring OPFMCC vehicles and OFFICE PRIDE® equipment to Integrity; and paying for Integrity's office buildout through his company SCB5 Enterprises, LLC (d/b/a CK Services).

### i. Bill Staggs Allows Integrity to Use the OPFMCC Warehouse as a Base of Operations.

77. Integrity currently uses as a base of operations a warehouse at 10241 Metro Parkway, Suite 111.

78. 10241 Metro Parkway, Suite 111 is the location from which Bill Staggs operated OPFMCC up through the end of May 2026. On information and belief, 10241 Metro Parkway, Suite 111 in Fort Myers, Florida is still leased by Bill Staggs.

79. Integrity employees were observed over the course of a week in June 2026 arriving and departing at 10241 Metro Parkway to obtain equipment and

supplies that they loaded into Integrity-owned work vans and trucks prior to traveling to customer locations—primarily former accounts of OPFMCC.

80.  Bill Staggs also continues to use 10241 Metro Parkway, Suite 111 all while Integrity's operations are ongoing there.

*ii.  Bill Staggs Transferred OPFMCC Vehicles and Equipment to Integrity.*

81.  Five commercial vehicles that are registered to Integrity and are used in Integrity's operations are the very same vehicles previously registered to and used by OPFMCC in its operations, and that previously bore OFFICE PRIDE® branding. Vehicle registration records reflect a transfer date of June 15, 2026. On information and belief, Integrity began using these OPFMCC vehicles while they were owned by Bill Staggs and/or Franchisee.

82.  On June 15, 2026 Bill Staggs and Howe visited the Lee County Tax Collector's office together to conduct a transaction. On information and belief, the purpose of their visit was to transfer vehicle registration of the OPFMCC vehicles to Howe to use for Integrity. The photo below shows Bill Staggs and Howe reviewing the paperwork prior to entering the Lee County Tax Collector's office.

23



83.     OFFICE  PRIDE®  franchisees  use  a  distinctively  designed  and branded green vacuum cleaner that is custom made for the company (the "Green Vacuum Cleaner"), as shown in the photo:



84. On June 15, 2026, private investigators documented former OPFMCC employee James Houser departing former OPFMCC customer Bank OZK — 47th Terrace carrying a Green Vacuum Cleaner and wearing an Integrity-branded vest.



85. On information and belief, Franchisee transferred OFFICE PRIDE® branded equipment to Integrity for use in its operations.

iii. *Bill Staggs Financed Integrity's Office Buildout.*

86. In addition to using the former OPFMCC warehouse as a base of operations, Integrity occupies office space at 12065 Metro Parkway, Suite 203 in Fort Myers.

25

87.    On June 7, 2026, a contractor's invoice for carpentry and painting services for Integrity's new offices at 12065 Metro Parkway, Suite 203 was sent to Howe's Office Pride email address. The invoice was made out to CK Services, and the cover email reads, "Bill said to make this out to CK services."

88.    CK Services is a fictitious business name registered to SCB5 Enterprises, LLC. SCB5 Enterprises is a Florida limited liability company managed by Bill Staggs.

89.    On information and belief, Bill Staggs facilitated and paid for the fit out of Integrity's office space through his company SCB5 Enterprises.

90.    The above allegations demonstrate that Bill Staggs is closely involved in supporting Integrity's operations. The acts violate the post-termination covenant not to compete, under which Franchisee promised to have no "*direct or indirect interest* as a disclosed or beneficial owner, investor, partner, director, officer, employee, consultant, representative or agent *or in any other capacity* in any Competitive Business . . ." (Exhibit A § 15.4.3.) (emphasis added)

### J.    Integrity Is Nothing More Than OPFMCC Operating Under a New Name

   *i.    Integrity's Customer Base Is Almost Entirely Former OPFMCC Accounts.*

91.    The magnitude of Integrity's diversion of OPFMCC's customers is astonishing. During surveillance conducted in June 2026, Integrity personnel were observed servicing or visiting 19 commercial cleaning locations in the Fort Myers and Cape Coral areas. Of those 19 locations, at least 14 are former OPFMCC customers.

92. The overwhelming overlap between Integrity's accounts and OPFMCC's former customer base is not a coincidence, but rather the direct and foreseeable result of Defendants' coordinated scheme to convert Faith Franchising's goodwill to their own benefit.

93. Integrity exists only because of Defendants' misappropriation of Faith Franchising's trade secrets and Confidential Information. Without the customer lists, contact information, pricing data, and account details that Howe took from OPFMCC, Integrity would have had no customers to service and no business to operate.

### ii. Integrity's Employees Are a Continuation of OPFMCC Staff Performing the Same Work for the Same Customers.

94. That Integrity is a mere continuation of OPFMCC is also demonstrated by the overlap in employees. Five former OPFMCC employees are known to have transferred directly to Integrity with no apparent gap in employment, and it is likely that some were working for both OPFMCC and Integrity simultaneously.

95. These former OPFMCC employees have been documented servicing former OPFMCC customer accounts using the same or similar equipment and vehicles and performing the same work they previously performed under the OFFICE PRIDE® brand:

> **Ramon Almengo** was documented operating a white 2007 Ford box truck recently transferred from OPFMCC to Integrity Companies LLC. On June 16, 2026, Almengo was observed wearing Integrity-branded clothing, transferring cleaning equipment to vehicles at the OPFMCC

warehouse, and moving cleaning equipment and performing other work-related activity at a former OPFMCC customer.

**Niurka Martinez** was observed on June 23, 2026, arriving at the former Office Pride warehouse wearing an Integrity-branded vest and loading cleaning supplies and equipment into a white Nissan van recently transferred from OPFMCC to Integrity, which she drove to clean at former OPFMCC customers UPD LLC, Joint Implant Surgeons of Florida, and ABA Results Therapy Center.

**William Chavez** was observed on June 16, 2026, operating a white 2021 Chevrolet pickup truck recently transferred from OPFMCC to Integrity, traveling with Howe to former OPFMCC customers AccuData Integrated Technologies and Busey Bank. On June 23, 2026, Chavez—wearing an Integrity-branded polo shirt—was observed at the former Office Pride warehouse making multiple trips carrying paper products and other supplies to a company vehicle.

**James Houser** was observed on June 15, 2026, servicing former OPFMCC customer Bank OZK — 47th Terrace while wearing a vest displaying the Integrity logo. He departed carrying a green, Office Pride-branded vacuum. On June 17, 2026, Houser was again observed traveling between the former Office Pride warehouse and other business locations while wearing Integrity-branded apparel. On June 23, 2026, Houser was observed arriving at the former Office Pride warehouse wearing an Integrity-branded vest.

**Chabelly Ortiz** was observed on June 22 and June 23, 2026 operating a 2010 white Ford Transit van recently transferred from OPFMCC to Integrity while making evening stops at multiple OPFMCC customers Colliers Engineering & Design, Britton G. Swank, P.A., Advanced Pain Management and Spine Specialists, Florida Neurology Group, CSCI, Marathon Engineering, and Accent Business Products. At Advanced Pain Management, Ortiz was observed entering the building alongside a second employee wearing an Integrity-branded vest.

96.    Based on the investigation and circumstances described herein, Howe

built Integrity with Bill Staggs' full approval and support using Faith Franchising's

28

trade secrets and its Confidential Information—including customer lists, customer contact information, pricing data, and account details.

97.    Bill Staggs actively assisted Howe in establishing Integrity by directly and indirectly diverting OFFICE PRIDE® customers in violation of the Agreement's in-term covenants not to compete. Bill Staggs has continued to the present day to provide ongoing material support to its operations, all in violation of the Agreement's post-termination covenants not to compete, reflecting the kind of material, ongoing stake in a competing enterprise that § 15.4 was designed to prevent.

98.    Viewed together, these facts demonstrate a coordinated effort to launch and sustain Integrity at Faith Franchising's expense.

99.    The Agreement imposed affirmative duties of loyalty, honesty, and good faith that Bill Staggs systematically violated through concealment, misrepresentation, obstruction, and active material support for a Competitive Business. Each of those acts, standing alone, constituted a breach of the Agreement. Taken together, they reveal a deliberate course of conduct designed to strip OPFMCC of its customer base for the benefit of Integrity while shielding that scheme from Faith Franchising's detection.

100.    Franchisee's obligations were not for Faith Franchising's benefit alone. The franchise system's confidentiality, non-competition, and loyalty provisions exist to protect the integrity of the OFFICE PRIDE® brand and the goodwill that all franchisees collectively invest in building. By facilitating the

29

wholesale diversion of OPFMCC's customer base to a competitor, Franchisee undermined the system-wide protections on which every OFFICE PRIDE® franchisee depends.

101. Howe eagerly accepted the benefits of Franchisee's violations to unfairly compete. Integrity is built on OPFMCC's trade secrets and Confidential Information, operates out of OPFMCC's warehouse, and uses OPFMCC employees and equipment to service the OPFMCC customers that Howe diverted in concert with Franchisee. Integrity is a business that Howe could not have built legitimately.

102. Based on the foregoing, Faith Franchising brings the following claims for relief:

<u>**COUNT I**</u>
**Breach of Franchise Agreement**
**(Post-Term Non-Compete, § 15.4)**
**(Against Bluegrass, Bill Staggs, and Crystal Staggs)**

103. Faith Franchising realleges and incorporates by reference Paragraphs 1-7, 20-21, 36-41, 62-64, 67, 75-101 as if fully set forth herein.

104. The Agreement is a valid and binding contract. Bill Staggs and Crystal Staggs are personally bound by the Personal Guarantees.

105. Faith Franchising's goodwill, customer relationships, and Confidential Information are legitimate business interests justifying enforcement of the restrictive covenants. *See* Fla. Stat. § 542.335(1)(b).

106. The Post-Term Non-Compete is reasonably necessary to protect Faith Franchising's legitimate business interests and is reasonably limited in time and geographic scope. *See* Fla. Stat. § 542.335(1)(c).

107. Integrity is a Competitive Business as defined in § 7.2.

108. By the conduct alleged herein, Franchisee has breached and continues to breach the Post-Term Non-Compete because Bill Staggs has a direct or indirect interest in Integrity, a Competitive Business operating within the restricted territory.

109. Bill Staggs and Crystal Staggs each executed Personal Guarantees agreeing to be personally bound by all terms of the Agreement.

110. By reason of the breaches alleged in Count I, Bill Staggs and Crystal Staggs are personally liable for all damages arising from Bluegrass's breaches of the Agreement.

111. The violation of an enforceable restrictive covenant creates a presumption of irreparable injury. *See* Fla. Stat. § 542.335(1)(j).

112. Faith Franchising has no adequate remedy at law and is entitled to injunctive relief.

113. Faith Franchising is entitled to attorneys' fees under § 17.9 of the Agreement and Fla. Stat. § 542.335(1)(k).

**COUNT II**
**Breach of Franchise Agreement**
**(Confidentiality and Non-Disclosure, §§ 6.2, 15.3)**
**(Against Bluegrass, Bill Staggs, and Crystal Staggs)**

114. Faith Franchising realleges and incorporates by reference Paragraphs 1-7, 20-34, 36-37, 42-43, 46, 53-54, 93, 96 as if fully set forth herein.

115. Franchisee is obligated to maintain the absolute confidentiality of Confidential Information during and after the term and to cease use upon termination.

116. Franchisee breached these obligations by failing to protect Faith Franchising's Confidential Information from misappropriation by Howe, by allowing Howe to continue accessing OPFMCC systems and email after his resignation, and by facilitating Howe's use of Confidential Information to establish and operate Integrity.

117. Bill Staggs and Crystal Staggs each executed Personal Guarantees agreeing to be personally bound by all terms of the Agreement.

118. By reason of the breaches alleged in Count II, Bill Staggs and Crystal Staggs are personally liable for all damages arising from Bluegrass's breaches of the Agreement.

119. Faith Franchising is entitled to injunctive relief and damages, including attorneys' fees under § 17.9 and Fla. Stat. § 542.335(1)(k).

**COUNT III**
**Breach of Franchise Agreement (Duty of Loyalty and Good Faith, §§ 1.6, 7.1.4, 8.1.13)**
**(Against Bluegrass, Bill Staggs, and Crystal Staggs)**

120. Faith Franchising realleges and incorporates by reference Paragraphs 2-6, 20-21, 34-35, 53-74, 93, and 97-100 as if fully set forth herein.

121. Under §§ 1.6 and 8.1.13, Franchisee was obligated to faithfully, honestly and diligently perform their obligations, to exert best efforts to promote the Business, and to observe high standards of honesty, integrity, and fair dealing.

122. Franchisee breached these obligations by:

(a) concealing from Faith Franchising that Howe had formed a competing business while employed by OPFMCC;

(b) failing to take reasonable steps to prevent the diversion of customers to Integrity during the term;

(c) performing acts injurious to the goodwill of the Marks, including facilitating the establishment and operation of a Competitive Business; and

(d) refusing to cooperate with Faith Franchising's inspection of the business.

123. Franchisee breached § 7.1.4 by directly or indirectly performing acts injurious or prejudicial to the goodwill associated with the Marks, including facilitating the diversion of commercial cleaning customers to Integrity.

124. Bill Staggs and Crystal Staggs each executed Personal Guarantees agreeing to be personally bound by all terms of the Agreement.

125. By reason of the breaches alleged in Count III, Bill Staggs and Crystal Staggs are personally liable for all damages arising from Bluegrass's breaches of the Agreement.

126. Faith Franchising is entitled to damages, including lost royalties, diminished customer value, and attorneys' fees under § 17.9.

## COUNT IV
### Misappropriation of Trade Secrets Under FUTSA (Fla. Stat. § 688.001 et seq.)
### (Against Howe and Integrity)

127. Faith Franchising realleges and incorporates by reference Paragraphs 1-6, 17-19, 22-25, and 42-43, 52, 54, 93, 96, 101 as if fully set forth herein.

128. Faith Franchising's Confidential Information — including customer lists, customer contact information, pricing and billing data, account details, and proprietary business methods — constitutes trade secrets under Fla. Stat. § 688.002(4). Faith Franchising derives independent economic value from this information not being generally known or readily ascertainable, and Faith Franchising has made reasonable efforts to maintain its secrecy, including through the confidentiality provisions of its franchise agreements and restricted access to the Vine intranet.

129. Howe had access to these trade secrets during his employment as Director of Operations.

130. On information and belief, Howe misappropriated Faith Franchising's trade secrets by using customer lists, contact information, pricing data, and other Confidential Information to solicit and service OPFMCC's former customers through Integrity.

131. Howe's misappropriation is evidenced by, among other things:

(a) the formation of Integrity while Howe was still employed and had access to Faith Franchising's trade secrets;

(b) Integrity's operation from the same address as OPFMCC;

(c) Integrity's servicing of former OPFMCC customer accounts;

(d) the employment of former OPFMCC employees by Integrity; and

(e) the timing of OPFMCC's customer losses, which accelerated coinciding with the formation of Integrity.

34

132.    Faith Franchising has been damaged by Howe's misappropriation and is entitled to injunctive relief under Fla. Stat. § 688.003(1), damages including unjust enrichment under Fla. Stat. § 688.004, and attorneys' fees under Fla. Stat. § 688.005.

## COUNT V
## Misappropriation of Trade Secrets Under DTSA (18 U.S.C. § 1836 et seq.)
## (Against Howe and Integrity)

133.    Faith Franchising realleges and incorporates by reference Paragraphs 1-6, 17-19, 22-25, and 42-43, 52, 54, 93, 96, 101 as if fully set forth herein.

134.    Faith Franchising's trade secrets, as described herein, were used in, and intended for use in, interstate commerce. Faith Franchising's System, Methods of Operations, proprietary software, and Confidential Information are developed, maintained, and transmitted across state lines to support a national franchise network spanning 27 states. The customer data, pricing structures, and operational procedures misappropriated by Defendants were integral to this interstate franchise system and were transmitted and stored through electronic systems operating in interstate commerce.

135.    Howe misappropriated these trade secrets in violation of the DTSA by acquiring them through his position of trust at OPFMCC and using them to establish and operate a competing business.

136.    Faith Franchising is entitled to injunctive relief under 18 U.S.C. § 1836(b)(3), damages under 18 U.S.C. § 1836(b)(3)(B), and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

## COUNT VI
## Tortious Interference with Business Relationships
## (Against Howe and Integrity)

137.   Faith Franchising realleges and incorporates by reference Paragraphs 1-6, 43-52, 68-73, 91-93, 97-98, 101 as if fully set forth herein.

138.   Faith Franchising had existing business relationships with the customers serviced by OPFMCC, including but not limited to the Bank OZK accounts and other accounts identified in the investigation. Upon termination, customer contracts and lists became Faith Franchising's property under §§ 6.4 and 14.3 of the Agreement.

139.   Howe and Integrity knew of these business relationships because Howe, as OPFMCC's Director of Operations, personally managed these customer accounts.

140.   Howe and Integrity intentionally and unjustifiably interfered with these business relationships by soliciting and servicing OPFMCC's former customers through Integrity, thereby inducing those customers to discontinue their relationship with Faith Franchising.

141.   As a direct and proximate result, Faith Franchising has suffered damages including lost customer revenue, lost royalties, and damage to its goodwill.

## COUNT VII
### Civil Conspiracy
### (Against Bluegrass Bill Staggs and Howe)

142. Faith Franchising realleges and incorporates by reference Paragraphs 1-6, 42-55, 64-90, 96-101 as if fully set forth herein.

143. Bill Staggs and Howe agreed and conspired among themselves to:

(a) form Integrity as a competing business designed to absorb OPFMCC's customers;

(b) conceal Howe's competing business from Faith Franchising;

(c) operate Integrity from the former OPFMCC warehouse using former OPFMCC vehicles and employees;

(d) use Faith Franchising's Confidential Information to solicit and service OPFMCC's former customers;

(e) wind down OPFMCC to clear the field for Integrity; and

(f) facilitate Integrity's operations through shared facilities, employees, and resources.

144. In furtherance of this conspiracy, Bill Staggs and Howe committed the overt acts alleged in paragraphs 42-55, 64-90, and 96-101, including the formation of Integrity, the concealment of Integrity from Faith Franchising, the continued use of the OPFMCC warehouse, the CK Services invoice, the ongoing communication between Bill Staggs and Howe regarding OPFMCC employees, and the diversion of OPFMCC customer accounts to Integrity.

145. As a direct and proximate result of Defendants' conspiracy, Faith Franchising has suffered damages including lost customer revenue, lost royalties, diminished goodwill, and costs of investigation.

## COUNT VIII
### Unfair Competition (Fla. Stat. § 501.204)
### (Against Howe and Integrity)

146. Faith Franchising realleges and incorporates by reference Paragraphs 3-5, 42-52, 65-71, 91-101 as if fully set forth herein.

147. Howe and Integrity have engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of commerce, including:

(a) forming a competing business while Howe was employed by OPFMCC and had access to Faith Franchising's Confidential Information;

(b) listing Integrity at OPFMCC's business address and referencing Office Pride in Integrity's business listings; and

(c) using Howe's Office Pride email address to conduct non-Office Pride business.

148. Howe and Integrity's conduct trades on Faith Franchising's goodwill and reputation and creates confusion in the marketplace.

149. Faith Franchising has suffered actual damages as a result and is entitled to injunctive relief, damages, and attorneys' fees under Fla. Stat. § 501.211.

## COUNT IX
### Fraudulent Concealment
### (Against Bluegrass, Bill Staggs, and Crystal Staggs)

150. Faith Franchising realleges and incorporates by reference Paragraphs 2-3, 5, 20-21, 34, 53-61, 64-75, as if fully set forth herein.

151. Bill Staggs had a duty to disclose material facts to Faith Franchising, arising from the Agreement's obligations of honesty, fair dealing, and cooperation (§§ 1.6, 8.1.13, 11.2), and from the parties' franchisor-franchisee relationship.

152. Bill Staggs knew that Howe had formed a competing commercial cleaning business in the same market while employed by OPFMCC. This was a material fact directly relevant to Faith Franchising's interests in the protection of its goodwill, its Confidential Information, and its customer relationships.

153. Despite this duty and knowledge, when Howe resigned in March 2026, Bill Staggs affirmatively represented to Faith Franchising that Howe was stepping away from work due to a family tragedy, concealing the formation of Integrity.

154. Faith Franchising did not learn of Integrity's existence until late April 2026.

155. Faith Franchising relied on Bill Staggs' representations and omissions to its detriment. Had Bill Staggs disclosed that Howe—with Bill Staggs' knowledge and support—was using Faith Franchising's trade secrets and goodwill to launch a competing business, Faith Franchising would have taken immediate steps to stop the misappropriation and protect its customer relationships, Confidential Information, and goodwill.

156. As a direct and proximate result of this concealment, Faith Franchising suffered damages including the loss of the opportunity to take timely action to protect its customer relationships, Confidential Information, and goodwill.

## COUNT X
## Unjust Enrichment
## (Against Howe and Integrity)

157.   Faith Franchising realleges and incorporates by reference Paragraphs 3-4, 42-52, and 91-101 as if fully set forth herein.

158.   Howe and Integrity have been unjustly enriched by profiting from customer relationships developed using Faith Franchising's System, Marks, Confidential Information, and goodwill.

159.   Howe and Integrity have received a benefit — in the form of revenue from former OPFMCC customer accounts — that in equity and good conscience they should not be permitted to retain.

160.   Faith Franchising is entitled to disgorgement of the profits Howe and Integrity have derived from servicing former OPFMCC customers.

## PRAYER FOR RELIEF

**WHEREFORE,** Faith Franchising prays this Court enter judgment in its favor and against Defendants as follows:

1. Restraining and enjoining Defendants Bluegrass, Bill Staggs, and Crystal Staggs, in any capacity directly or indirectly, from having any interest in or performing services for any Competitive Business within a 50-mile radius of the Fort Myers, Florida market or the Fort Myers metropolitan area for a period of twenty-four (24) months;

2. Restraining and enjoining Defendants Howe and Integrity from using, disclosing, or in any way appropriating Faith Franchising's Confidential Information and trade secrets;

3. Restraining and enjoining Defendants Howe and Integrity from soliciting, servicing, or otherwise doing business with any

40

customer formerly serviced by OPFMCC or any other OFFICE PRIDE® franchise;

4. Ordering Defendants to return to Faith Franchising all copies of the Methods of Operations and any other confidential materials;

5. Ordering Defendants to provide an accounting of all customers serviced by Integrity and all revenue derived from former OPFMCC customer accounts;

6. Ordering Defendants to cease use of Office Pride trademarks or resources;

7. Ordering Defendants to remove all references to Office Pride from any business listings, marketing materials, or online presence;

8. Awarding Faith Franchising compensatory damages, including but not limited to lost royalties, diminished customer value, and costs of investigation;

9. Awarding Faith Franchising disgorgement of all profits Defendants have derived from the wrongful conduct alleged herein;

10. Awarding Faith Franchising exemplary and punitive damages against Howe and Integrity, including under Fla. Stat. § 688.004(2) for their willful and malicious misappropriation of trade secrets under the Florida Uniform Trade Secrets Act and under 18 U.S.C. § 1836(b)(3)(C) for their willful and malicious misappropriation of trade secrets under the Defend Trade Secrets Act.

11. Awarding Faith Franchising its attorneys' fees, costs, and expenses incurred in this action pursuant to the Agreement, Fla. Stat. § 542.335(1)(k), Fla. Stat. § 688.005, Fla. Stat. § 501.211, 18 U.S.C. § 1836(b)(3)(D), and any other applicable provision of law;

12. Awarding Faith Franchising pre-judgment and post-judgment interest as allowed by law; and

13. Awarding such other and further relief as the Court deems just and proper.

Dated: July 16, 2026         Respectfully Submitted,

*/s/ Traci T. McKee*
Traci T. McKee, Fla. Bar No. 53088
Blake D. Bachman, Fla. Bar No. 1040691
FAEGRE DRINKER BIDDLE & REATH LLP
1500 Jackson Street, Suite 201
Fort Myers, Florida 33901
Tel: (239) 286-6900
Fax: (239) 244-9053
traci.mckee@faegredrinker.com
blake.bachman@faegredrinker.com

*Attorneys for Plaintiff Faith Franchising Company, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on July 16, 2026, I caused the foregoing document to be electronically filed via the Court's CM/ECF system, which will send electronic notification of such filing to all registered counsel.

The foregoing document was also sent via email and process server to Defendants.

/s/ Traci T. McKee
Traci T. McKee